UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| v. : | Case No. 1:25-cr-117 (TNM) |
| : | |
| CHRISTOPHER FORBES, : | |
| : | |
| Defendant. : | |

**UNITED STATES' MEMORANDUM IN AID OF SENTENCING**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits its Memorandum in Aid of Sentencing as to Defendant Christopher Forbes (hereafter, the "Defendant"). On June 6, 2025, the Defendant pled guilty to Counts One and Three of the Indictment [ECF No. 1], charging him with Unlawful Possession of a Firearm and Ammunition, in violation of 18 U.S.C. § 922(g)(1) (Count One); and Unlawful Discharge of a Firearm, in violation of 22 D.C. § 4503.01 (Count Three). Sentencing is scheduled for September 15, 2025.

For the reasons set forth below, the United States respectfully requests that the Court impose a sentence of 71 months of incarceration as to Count One and 12 months of incarceration as to Count Three, with the terms to run concurrently. Additionally, the United States request that the Court impose a term of 36 months of supervised release.

**I.      FACTUAL AND PROCEDURAL BACKGROUND**

In the early morning hours of April 5, 2025, just before 6:00 a.m., Metropolitan Police Department ("MPD") officers responded to the sound of gunfire in the 1800 block of A Street SE, Washington, D.C. This is near the Stadium Armory Metro station in the residential neighborhood known as "Hill East," which is made up of rowhomes, apartment buildings, and schools. Specifically, Shotspotter technology detected four shots fired, with multiple 911 callers also

reporting gunfire. One caller, who reported seeing a male yelling on the phone outside immediately after the gunfire, provided a description of the male's clothing. When law enforcement arrived in the area, they also observed a male, later identified as the Defendant, yelling on the phone.

Law enforcement waited for additional information regarding the lookout description before approaching the Defendant. While they were waiting, a Metro Transit driver ("W-1") pulled up in a Metro Transit van and beckoned the officers over. In sum and substance, W-1 advised law enforcement that they needed to keep an eye on the Defendant, that he "had something on him," and that they should "be careful." W-1 also indicated that the Defendant was fighting with his girlfriend. Based on W-1's information and further detail about the lookout description, law enforcement attempted to locate the Defendant, who had had walked out of view of law enforcement. They soon located him nearby, however, outside of 1816 Independence Ave. SE.

At the time, the Defendant was still yelling on the phone. As law enforcement approached and asked the Defendant to display his hands, he tossed his phone to the ground, irate and yelling. Based on the information they had received, law enforcement performed a protective pat down of the Defendant. When asked if he had anything on him, the Defendant initially said no before admitting that he did, in fact, have something on him, stating that he had "[his] dog" on his hip. Officers then located a firearm inside of the Defendant's waistband, as depicted in Figure A below:



*Figure A: screenshots of BWC showing recovery of firearm from Forbes*

The firearm recovered from the Defendant was a stolen Smith & Wesson, SD40VE, .40 caliber pistol affixed with a weapon-mounted light underneath the barrel, covering the serial number (later identified as FWL6220). The firearm, depicted in Figure C below, had one (1) .40 caliber round in the chamber and one (1) .40 caliber round in a fourteen (14) round capacity magazine, as seen in Figure B below:



*Figure B: .40 caliber firearm recovered from the defendant*

3

Law enforcement also recovered four spent .40 caliber casings from the area in front of the Stadium Armory Metro station; preliminary ballistics analysis indicates that the casings were discharged from the same .40 caliber firearm recovered from the Defendant. Following his arrest, the Defendant waived his *Miranda* rights, admitted possessing the firearm, and indicated that he had been arguing with a female. The Defendant was arrested and charged by complaint in D.C. Superior Court that same day.

On April 24, 2025, the Defendant was charged by indictment in the instant case with three counts: Unlawful Possession of a Firearm and Ammunition by a Person Convicted of Crime Punishable by Imprisonment for a Term Exceeding One Year, in violation of 18 U.S.C. § 922(g)(1) (Count One); Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Domestic Violence Misdemeanor, in violation of 18 U.S.C. § 922(g)(9) (Count Two); and Unlawful Discharge of a Firearm, in violation of 22 D.C. Code 4503.01 (Count Three). On June 6, 2025, the Defendant pled guilty pursuant to the terms of a written plea agreement (ECF No. 11) to Unlawful Possession of a Firearm and Ammunition by a Person Convicted of Crime Punishable by Imprisonment for a Term Exceeding One Year, in violation of 18 U.S.C. § 922(g)(1) (Count One); and Unlawful Discharge of a Firearm, in violation of 22 D.C. Code 4503.01 (Count Three).

## II.     LEGAL STANDARD

Pursuant to 18 U.S.C. § 3553(a), the Court shall impose a sentence that is sufficient, but not greater than necessary, to "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;" "to afford adequate deterrence to criminal conduct;" "to protect the public from further crimes of the defendant;" and to "provide the defendant with needed educational or vocational training." 18 U.S.C. § 3553(a)(2). In addition, the Court must also consider "the nature and circumstances of the offense and the history and

characteristics of the defendant;" the types of sentences available, the Sentencing Guidelines; any pertinent policy statements; the need to avoid unwarranted sentence disparities; and the need to provide restitution to any victims. *Id.* § 3553(a).

The listed factors in 18 U.S.C. § 3553(a) include the following:

1) The nature and circumstances of the offense and the history and characteristics of the defendant;

2) The need for the sentence imposed –
   a) To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
   b) To afford adequate deterrence to criminal conduct;
   c) To protect the public from further crimes of the defendant; and
   d) To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

3) The kinds of sentences available;

4) The kinds of sentence and the sentencing range established for –
   a) The applicable category of offense committed by the applicable category of defendant as set forth in the guidelines –
      i) Issued by the Sentencing Commission . . . ; and
      ii) That . . . are in effect on the date the defendant is sentenced

5) Any pertinent policy statement –
   a) Issued by the Sentencing Commission . . . and
   b) That . . . is in effect on the date the defendant is sentenced

6) The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

7) The need to provide restitution to any victims of the offense.

Procedurally, after calculating the applicable Guidelines range, the Court should next consider all the applicable factors set forth in 18 U.S.C. § 3553(a). Indeed, the Guidelines themselves are designed to calculate sentences in a way that implements the considerations relevant to sentencing as articulated in Section 3553(a). *Rita v. United States*, 127 S. Ct. 2456, 2463 (2007).

5

### III.    GUIDELINES CALCULATION

#### A.    Total Offense Level

With respect to Count One (a violation of 18 U.S.C. § 922(g)(1)), the base level is 20 because the Defendant possessed the firearm after being convicted of a crime of violence (Robbery in Prince George's County, Maryland, case number 16-CR-23-000443). *See* U.S.S.G. § 2K2.1(a)(4). The firearm was stolen; accordingly, the base offense level is increased two levels, pursuant to U.S.S.G. § 2K2.1(b)(4)(A). Because the firearm was also possessed in connection with another felony offense (Unlawful Discharge, as charged in Count Three), the base offense level is increased four levels, pursuant to U.S.S.G. § 2K2.1(b)(6)(B), resulting in an adjusted offense level of 26, as noted in the Final Presentence Report (the "PSR") [ECF No. 18]. After a three-level reduction for acceptance of responsibility is applied, pursuant to U.S.S.G. §§ 3E1.1(a) and 3E1.1(b), the final offense level is 23. With respect to Count Three, a violation of 22 D.C. Code 4503.01 is governed by the D.C. Voluntary Sentencing Guidelines ("D.C. VSG") and falls within Offense Severity Group 9.

As noted in the PSR, the Defendant objects to the guidelines calculation and argues that Maryland robbery is not a crime of violence for purposes of U.S.S.G. § 2K2.1(a)(4). The United States respectfully agrees with the conclusion of the PSR writer and submits that Maryland robbery qualifies as a "crime of violence" under U.S.S.G. § 4B1.2(a), both under the elements clause (because it has "as an element the use, attempted use, or threatened use of physical force against the person of another") and under the enumerated offense clause (because it "is . . . robbery").

As the Fourth Circuit recently explained in a comprehensive opinion addressing this specific question, Maryland robbery categorically requires the use of force against the person of another. *See United States v. Shanton*, 125 F.4th 548 (4th Cir. 2025). Maryland robbery requires

the knowing or institutional use of force against another person, not just recklessness, and not just an intent to steal; it thus remains a crime of violence even after *Borden v. United States*, 593 U.S. 420 (2021). *See Shanton*, 125 F.4th at 551-54. For reasons that *Shanton* gives, the contrary interpretation of Maryland robbery in *Redacted v. Redacted*, 2022 WL 4546737 (D.D.C. Aug. 29, 2022)—resting on the assumption that Maryland robbery can be committed recklessly—is incorrect. Moreover, even if Maryland robbery did not satisfy the elements clause, it qualifies as generic robbery under the enumerated offense clause. As *Shanton* explains, "Maryland robbery has been judicially defined to be the same as the traditional common-law definition of robbery." 125 F.4th at 552. It is, accordingly, the classic expression of generic robbery. *See also Stokeling v. United States*, 586 U.S. 73, 78-83 (2019).

In support of his objection, the Defendant cites to several cases, including *Redacted*, 2022 WL 4546737 (D.D.C. Aug. 29, 2022). Notably, these all appear to pre-date the comprehensive ruling issued in *Shanton* that addresses this very issue. At least one other judge in this district has since also applied *Shanton*'s analysis in finding Maryland robbery is, indeed, a crime of violence. *See U.S. v. Whittico*, No. 24-cr-13 (JDB) (D.D.C. June 24, 2025) (Sent'g Tr, at ECF No. 52). In reaching his decision, the Honorable Judge John D. Bates noted, among other things, that the Fourth Circuit, which includes Maryland within its jurisdiction, based its opinion on a review of many prior decisions from Maryland courts. Id. at 10, ln. 12.

Nor does *U.S. v. Burwell*, 122 F.4th 984, 986 (D.C. Cir. 2024), which the Defendant also relies on, alter the legal conclusion that Maryland robbery is a crime of violence because that case "concern[ed] whether federal bank robbery, 18 U.S.C. § 2113(a), was a crime of violence under § 924(c)." (emphasis added) 122 F.4th at 986. Unlike *Shanton*, the *Burwell* court did not analyze the case law involving Maryland robbery; rather, the *Burwell* court analyzed federal bank robbery,

holding that "18 U.S.C. § 2113(a) is indivisible as to extortion… as an indivisible offense, bank robbery is not a § 924(c) crime of violence." *Id*. at 986 (emphasis added).  In light of the Fourth Circuit's recent decision in *Shanton*, as well as Judge Bate's ruling, the United States respectfully submits that Maryland robbery is a crime of violence for the purposes of applying U.S.S.G. §2K2.1(a)(4).

      **B.**      **Criminal History Category**

The PSR writer calculates the Defendant to have a total of five criminal history points, which places him in Criminal History Category III.  *See* PSR ¶ 41.[1]

      **C.**      **Sentencing Guidelines Range**

With respect to Count One, based on a final offense level of 23 and Criminal History Category III, the resulting guidelines range is 57 to 71 months of incarceration, one to three years of supervised release, and a fine range of $20,000 to $200,000.  *See* U.S.S.G. §§ 5D1.2(a)(2) and 5E1.2(c)(3).  With respect to Count Three, the DC VSG provides for a range of 5 to 20 months of imprisonment.

**IV.**      **ARGUMENT**

As stated above, the United States respectfully requests that the Court sentence the Defendant to a term of 71 months of incarceration on Count One and 12 months of incarceration on Count Three, to run concurrently, followed by 36 months of supervised release.  For the reasons detailed below, the United States respectfully submits that such a sentence is sufficient, but not greater than necessary, to serve the interests of justice and appropriately balances the sentencing factors under 18 U.S.C. § 3553(a).

---

[1] For purposes of the D.C. VSG, the Defendant's criminal history is classified as Criminal History Score C.

1. **The Nature, Circumstances, and Seriousness of the Offense**

Certainly, any case involving the unlawful possession of a loaded firearm is serious by its very nature. The dangerous nature of firearms offenses is especially highlighted, however, in cases like this one – where the Defendant not only unlawfully possessed a firearm *but also used that firearm* – discharging four shots near a Metro station in a residential neighborhood in D.C. Although this conduct would be incredibly troubling on its own, the specific circumstances surrounding the conduct only magnify how serious and dangerous it is. The Defendant fired the gun – more than once – during what appears to have been a fit of rage stemming from an argument with a female acquaintance. And he did so on a public street near a Metro entrance in the early morning hours – as members of the community who lived nearby were stirring.

2. **The Defendant's History and Characteristics**

The United States commends the Defendant's early acceptance of responsibility – indeed, he indicated his intent to plead guilty almost from the beginning. Nor does the United States overlook the impact of the difficult circumstances of his childhood, as reflected in the PSR. *See* PSR ¶ 67. Notwithstanding his acceptance of responsibility and the mitigating circumstances of his upbringing, however, the Defendant's established record of assaultive conduct and unlawful firearms possession is incredibly troubling and underscores the danger he poses to the community.

Since 2015 – when he was just 20 years old – and continuing until his arrest in this case, he has amassed repeated arrests and convictions, ranging from traffic offenses to child cruelty to robbery. Indeed, even setting aside the instant case, between 2015 and 2025, he appears to have been arrested on approximately *sixteen* separate occasions. Although his first two convictions (2018 and 2019) were vehicle-related (Driving on a Suspended License), the facts of his 2020 Florida firearms conviction bear a troubling resemblance to the facts of the instant case, given that

he similarly fired a gun four times in what again appears to have been a fit of rage. Notably, the Florida incident was clearly also motivated by an argument with a family member during which the Defendant lost control. Although it appears that his child was inside the home when the Defendant opened fire, it is clear that even the presence of a minor child was not sufficient to temper his actions, which placed all those around him at risk.

This pattern of assaultive conduct, particularly in the domestic context, is also borne out by his 2022 conviction for Simple Assault and Attempted Second Degree Child Cruelty, in which he struck his child and the child's mother, threatening to kill them both. The Defendant then turned his rage on a witness who tried to intervene, threatening to kill the witness as well before taking her purse and keys, and then threatening the law enforcement officers that responded. Nor does the Defendant's pattern of assaultive behavior and involvement with firearms end there. In 2022, he was convicted of robbery in Maryland – according to the PSR, he robbed a store and then used a gun to threaten the store manager who confronted him as he was leaving. He then violently assaulted the store manager, as well as another individual who came to the manager's aid, before fleeing. Put simply, the Defendant's history and characteristics demonstrate a highly dangerous combination: an inability, or unwillingness, to control himself and his actions; a history of violent, assaultive conduct; and repeated possession, *and use*, of firearms.

### 3.     The Need to Promote Respect for the Law and Deterrence

As called for by the statute, the sentence should reflect the seriousness of the offense, promote respect for the law, afford adequate deterrence, and provide just punishment for the offense. *See* 18 U.S.C. § 3553(a)(2). The United States respectfully submits that the need to deter the Defendant weighs in favor of the recommended sentence, which would be the lengthiest period of incarceration yet served by the Defendant. It cannot be overlooked that the Defendant was on

supervised release for the robbery when he committed the instant offense; the PSR also indicates that he has at least one outstanding warrant related to violations of probation, and he has a demonstrated history of failing to comply with conditions of supervision and court order. In sum, notwithstanding his many arrests and previous interactions with the criminal justice system, he has yet to be deterred. As such, the United States submits that a substantial sentence is necessary to deter him from future criminal conduct.

### 4. Other factors

The United States' recommended sentence is also justified to protect the public and to give the Defendant ample time to pursue further educational and vocational training and to participate in other programs aimed at rehabilitation. Despite having been previously ordered to participate in domestic violence intervention, mental health treatment, and other beneficial programs as terms of probation, it is clear from the PSR that he has been unwilling to do so while on probation.

## V. CONCLUSION

For the foregoing reasons, the United States respectfully requests the Court sentence the Defendant to 71 months of imprisonment on Count One and 12 months of imprisonment on Count Three, to run concurrently, followed by 36 months of supervised release.

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

By:   */s/ Andrea Duvall*
ANDREA DUVALL
AR Bar No. 2013114
Assistant United States Attorney
601 D Street, NW
Washington, D.C. 20530
andrea.duvall@usdoj.gov
(202) 394-3006